Filed 8/26/21  P. v. Moore CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAYMON ZACHARY MOORE,<br><br>    Defendant and Appellant. | E073461<br><br>(Super.Ct.No. FSB033089)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  J. Michael Welch, Judge.  Reversed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorney Generals, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos, Joseph C. Anagnos and James R. Secord, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Daymon Zachary Moore appeals the summary denial of his petition for resentencing under Penal Code[1] 1170.95.  For the reasons set forth *post*, we remand the matter to the trial court for further proceedings, including the issuance of an order to show cause and an evidentiary hearing in accordance with section 1170.95, subdivision (d).

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

On January 2, 2002, a felony complaint charged defendant with first degree murder under section 187, subdivision (a) (count 1); first degree burglary under sections 459 and 460, subdivision (a) (count 2); and attempted first degree robbery under sections 211, 212.5, subdivision (a), and 664 (count 3).  As to count 1, the complaint also alleged that pursuant to section 12022, subdivision (d), a principal was armed with a firearm during the commission of the offense and that defendant, "not personally armed, knew that a principal was personally armed with a firearm."  On March 23, 2004, a jury found defendant guilty of counts 1, 2 and 3, but found the firearm enhancement to be not true.

On April 7, 2005, the trial court sentenced defendant to a term of 25 years to life in prison, as follows:  25 years to life for count 1; the middle term of four years for count 2, to run concurrently with count 1; and the middle term of two years for count 3, to run concurrently with count 2.

---

[1]  All further statutory references are to the Penal Code unless otherwise specified.

On August 18, 2006, in an unpublished opinion, this court affirmed the judgment. (*People v. Moore* (Aug. 18, 2006, E038142) Nonpub. Opn.)

On January 9, 2019, pursuant to section 1170.95, defendant filed a petition to vacate his first degree murder conviction and resentence him on the remaining counts. On February 5, 2019, the People filed a motion to strike the petition alleging that section 1170.95 was unconstitutional. Defendant filed opposition to the motion to strike.

On March 29, 2019, the trial court held a hearing on defendant's petition. The court tentatively ruled that it did not need to reach the constitutional question because defendant had failed to state a prima facie case for relief. Defendant requested a continuance to obtain the reporter's transcripts of the jury trial; the court granted defendant's request.

On August 16, 2019, the trial court held the continued hearing on defendant's petition. After hearing argument from counsel, the court denied the petition. It found that defendant was ineligible for resentencing because he: (1) intended to kill the victim; (2) was a major participant as an aider and abettor to the underlying felonies; and (3) may have been the actual shooter.

On August 20, 2019, defendant filed a timely notice of appeal.

B.    FACTUAL HISTORY[2]

"Keshia Bennett lived in apartment 26 of a complex at 16th and Arrowhead in San Bernardino, an upstairs unit. The morning of December 28, 2001, Bennett and another

---

[2] The facts are taken from the unpublished opinion in case No. E038142.

3

resident, Joel Torres, saw defendant at the complex wearing white pants, a black leather jacket, black boots, and a white visor.

"About 1:00 p.m. that day, Vernetta Rollins, a friend of Bennett's, was in apartment 26 while Bennett was out. At some point, Herbert Johnson came through the door of the apartment. He looked scared and told Rollins to call the police. Rollins went to the bedroom and called the police. While still in the bedroom, she heard three voices from the living room, including Mr. Johnson's. After that, she heard about five gunshots. Torres, downstairs, heard 'four pops.' He looked out his window and saw two men, one of whom Torres was 'pretty sure' was defendant. That man was wearing white pants and a black leather jacket and was tucking a handgun in the back of his pants.

"An autopsy revealed Johnson died of gunshot wounds to the chest and abdomen."

"Detective Carr interviewed defendant twice at the police station after the shooting. The interviews were videotaped, and the tapes and transcripts of them were introduced at trial."

"The police arrested defendant on the evening of the shooting. About 10:50 that evening, Detective Carr interviewed defendant after defendant waived his Miranda rights. Defendant was wearing a tan shirt and blue pants or jeans.

"Defendant denied being at the apartment complex on the day of the shooting. He said that about 12:00 or 1:00 p.m. on that day, he was at a house across the street from the complex, visiting with his friend Meetchie and some other people. Between 12:00 and 1:00, defendant borrowed a car and gave two women, Keisha and Mubby, a ride to a pawnshop, where Keisha pawned a stereo. He drove back to Meetchie's house and, after

4

awhile, called his brother Shane to pick him up. He spent the rest of the day and evening at his mother's house, where he was living.

"Carr told defendant he was going to investigate his story, and it was 'gonna start falling apart.' He said he had physical evidence proving defendant had been in Bennett's apartment. Carr suggested defendant had gone into the apartment 'with the wrong person,' not knowing the shooting was going to happen, and 'got kind of sucked into' the crime. The interview ended shortly after midnight.

"Later that day, Carr went to the pawnshop to which defendant had referred. No one named Keisha had made a pawn on the day of the shooting. Carr also went to the apartments at which defendant had said Keisha and Mubby lived. No one there knew anyone named Keisha or Mubby."

"About 6:15 p.m. the same day, Carr interviewed defendant again for about two hours. After again reading defendant his Miranda rights, Carr told defendant he had gone to the pawnshop, and defendant's story had not checked out. He also told defendant his palm prints were on the inside of the door to apartment 26 and on a glass table inside the apartment. Carr said defendant was 'fucked' unless he came up with a reason why he was in the apartment.

"Defendant then said, 'It was a robbery.' He said that just before the shooting, a man he did not know approached him on the street next to the complex. The man asked defendant if he wanted to make some money. He said the intended victim sold drugs and had a lot of money. He told defendant, '[J]ust follow me,' so defendant followed him.

"The intended victim took off running, so they chased him into apartment 26, and defendant pushed the door in. The other man produced a gun and told the victim to give him his money and car keys. The victim tried to grab the gun, and the man shot him. Defendant took off.

"After the interview ended, Carr asked defendant what he was wearing at the time of the incident. Defendant said he was wearing white pants and a black jacket."

"Defendant testified that after he woke up on the morning of December 28, 2001, he went to an appointment with his probation officer. After that, he went to Meetchie's house. After defendant finished visiting, he walked across the street to the apartment complex. He went to apartment 29 and visited Andrew, a man he knew from his former employment. Defendant was wearing blue jeans, a white T-shirt, and a tan shirt. He did not tell Carr that he had been wearing a black jacket and white pants that day.

"After visiting apartment 29, defendant took Keisha and Mubby to the pawnshop. Then he dropped Mubby off at her home and drove to his girlfriend's house. His girlfriend, Andrea, called his mother, and she came and picked defendant up. They went to the grocery store and then home. Defendant did not leave the house after that except to walk his dog that evening.

"Defendant further testified that after he was arrested, he was given nothing to eat or drink. He slept on a cold cement slab with no blanket. He drank some water from a sink in the cell and threw up.

"When Carr interviewed him the second time, defendant testified, he was tired. He also was scared because Carr kept cussing at him. He falsely told Carr he had been

6

involved in the shooting because he was afraid the police were going to hurt him or beat him, or something like that. He thought that if he told Carr what he wanted to hear, Carr probably would let him go home. The details he told Carr about the shooting included some facts he learned from his brother Kenny, some he learned from Carr himself, and others he just made up.

"Brenda Johnson, defendant's mother, testified that she picked defendant up at his girlfriend's house between 12:45 and 12:50 p.m. on December 28, 2001. Defendant was wearing brown khaki pants, a white T-shirt, and a brown and white checkered shirt. She stopped at a Stater Brothers grocery store at Baseline and Waterman and then drove home, arriving sometime after 1:30. Defendant did not leave the house until the police arrested him that night.

"Debra Caro was formerly involved with defendant's brother and had guardianship of his four children. Caro also was a good friend of Ms. Johnson. She testified that on December 28, 2001, she let Ms. Johnson use her car to go to the store. She brought the car to Ms. Johnson's house, and Ms. Johnson left the house in the car about 12:10 or 12:15 p.m.

"Ms. Johnson returned at about 1:25 or 1:30 p.m. with bags of groceries from Stater Brothers. Defendant was in the car with her. Defendant was wearing white pants and had no shirt on. He was 'all sweaty.'

"Edgar Samayoa lived in apartment 24 of the complex at the time of the shooting. About 1:00 p.m., he saw a man who appeared to be Mr. Johnson being chased by two

7

black males, one wearing a black jacket and probably a visor.  Samayoa did not recognize

defendant as either of the men who chased Mr. Johnson.”

"Carr testified that he talked to Ms. Johnson when defendant was arrested on the

evening of the shooting.  She was unable to account for defendant between 12:00 and

1:30 p.m. that day.

"An officer interviewed Mr. Samayoa an hour or two after the shooting.  Samayoa

said one of the men who pursued Mr. Johnson was wearing a black jacket and white

pants and had a light-colored visor.

"The shooting location, Ms. Johnson’s house, defendant’s girlfriend’s house, and

the Stater Brothers at Baseline and Waterman were all within a radius of no more than 10

miles.

"On October 3, 2003, defendant called Ms. Johnson from jail.  The call was

recorded.  Defendant said the trial was ‘not going good’ because of ‘what I said.’

Defendant said, ‘[T]hey just know I was involved with it,’ but they were not accusing

him of killing Mr. Johnson.  ‘They know I didn’t do it, but I was there.’ ”

## DISCUSSION

Defendant contends that the trial court erred in finding him ineligible for relief

under section 1170.95 without issuing an order to show cause and conducting an

evidentiary hearing.  The People initially contended that defendant forfeited his claim,

and even if he did not forfeit his argument, a summary denial was appropriate.  However,

on August 4, 2021, the People submitted a letter conceding that defendant “is entitled to

an evidentiary hearing” because “there is nothing in appellant’s record of conviction that

8

conclusively shows he is ineligible for relief as a matter of law." We agree with the parties and remand this case to the trial court.

The Legislature enacted Senate Bill No. 1437 (Sen. No. 1437) to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); *People v. Gentile* (2020) 10 Cal.5th 830, 842; *People v. Martinez* (2010) 31 Cal.App.5th 719, 723.) To accomplish this objective with respect to the natural and probable consequences doctrine, Sen. No. 1437 added section 188, subdivision (a)(3), defining malice, to require that all principals to murder must act with express or implied malice to be convicted of that crime, with the exception of felony murder under section 189, subdivision (3). (Stats. 2018, ch. 1015, § 2; *Gentile*, at pp. 842-843.) By these amendments, Sen. No. 1437 thus altogether eliminated natural and probable consequences liability for murder. (*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*).)

Sen. No. 1437 also added section 1170.95 to provide a procedure by which persons previously convicted of murder under a natural and probable consequences theory may seek retroactive relief if they could no longer be convicted of murder because of the amendments to section 188. (*Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile*, *supra*, 10 Cal.5th at p. 843; *People v. Martinez*, *supra*, 31 Cal.App.5th at pp. 722-723.) Subdivision (a) of section 1170.95 sets forth the requirements for a facially sufficient petition. The petitioner must aver that (1) the charging document "allowed the

9

prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; (2) "petitioner was convicted of first or second degree murder"; and (3) "petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a); *People v. Drayton* (2020) 47 Cal.App.5th 965, 973.) Subdivision (c) in turn "describes where and how the petition must be filed and specifies its required content," including a declaration by the petitioner that he or she "is eligible for relief according to the criteria set out in subdivision (a)." (*Drayton*, at p. 973.) "If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis*, at p. 960.)

If a petition for resentencing under section 1170.95 meets the requirements of subdivisions (a) and (b), the trial court proceeds to subdivision (c)(4) "to assess whether the petitioner has made 'a prima facie showing' for relief." (*Lewis*, *supra*, 11 Cal.5th at p. 960.) At this stage, the trial court must accept briefing from the parties before making its prima facie determination of eligibility. (*Id.* at p. 966.)

With the benefit of the parties' briefing, the trial court may then consider the record of conviction, including the jury instructions, verdict form(s), and any special findings or enhancement allegations the jury found true to determine if the petition makes a prima facie showing of entitlement to relief. (*Lewis*, *supra*, 11 Cal.5th at pp. 970-971; *People v. Duchine* (2021) 60 Cal.App.5th 798, 815.) Although "[t]he record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that

10

are clearly meritless . . . [¶] . . . the prima facie inquiry under subdivision (c) is limited." (*Lewis*, at p. 971.) Thus, in conducting its prima facie review, the trial court does not engage in factfinding, but " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Ibid.*) " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

If the trial court determines that petitioner has made a prima facie showing for relief, the court must issue an order to show cause, "and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis*, *supra*, 1 Cal.5th at p. 960.)

In this case, the trial court appointed counsel for defendant, and the parties filed briefing on the issue. At the hearing on the petition, however, the trial court found defendant ineligible for resentencing under section 1170.95 because defendant (1) intended to kill the victim; (2) was a major participant in the crime as an aider and

11

abettor; and (3) may have been the actual shooter. On appeal, defendant contends that "the trial court incorrectly determined that appellant was ineligible for section 1170.95 resentencing as a mater of law" because he "made a prima facie showing that he was eligible for re-sentencing."

Here, defendant alleged that (1) an accusatory pleading was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) a jury convicted him of first or second degree murder under the felony-murder rule or the natural and probable consequences doctrine; and (3) he could not now be convicted of felony murder or murder under the natural and probable consequences doctrine due to the 2019 changes made to sections 188 and 189. (§ 1170.95, subd. (a)(1), (2), & (3).)

Defendant's petition satisfied the criteria for a facially sufficient petition under section 1170.95, subdivisions (a) and (b), and the record of conviction did not demonstrate ineligibility for relief as a matter of law. Remand is required to enable the trial court to issue an order to show cause and conduct an evidentiary hearing under section 1170.95, subdivisions (c) and (d).

A defendant is ineligible for relief *as a matter of law* where the record conclusively shows that the jury actually relied—and the defendant's murder conviction actually rests—upon on a theory of liability that is unaffected by section 1170.95 (that is, on the theory that defendant was the actual killer or directly aided and abetted the killing).

12

Here, the record of conviction does not establish, *as a matter of law*, that appellant is not eligible for relief. The record shows the jury did *not* find that defendant had personally killed the victim. There was substantial evidence, however, to support both direct aiding and abetting and natural and probable consequences theories of guilt. The fact that substantial evidence supports defendant's conviction on a valid theory, however, does not mean that the record in this case conclusively shows that the jury *actually relied* upon that valid theory or that the jury did not rely on the invalid theory. (*People v. Drayton*, *supra*, 47 Cal.App.5th at p. 968 [in assessing whether a petitioner has established a prima facie case, the trial court "should accept the assertions in the petition as true unless facts in the record *conclusively refute them as a matter of law*", italics added].) To the contrary, the record in this case reveals that the jury was instructed on two theories—one valid under section 1170.95 (that is, direct aiding and abetting) and one invalid under section 1170.95 (that is, natural and probable consequences liability)—and the jury's general verdict finding of guilt does not conclusively establish *which* of these theories the jury actually relied upon in returning that verdict. (Cf. *People v. Edwards* (2020) 48 Cal.App.5th 666, 674, review granted Jul. 8, 2020, S262481 [defendant is ineligible for section 1170.95 relief as a matter of law if the jury is never instructed on an invalid theory].)

In this case, the trial court instructed the jury as follows:

(A) "Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. . . . Principals include" those who

directly and actively, or aid and abet the commission or attempted commission of the crime;

(B) "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourage or instigates the commission of the crime." However, "mere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting";

(C) Natural and probable consequences instruction;

(D) Felony-murder rule—"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs [during the commission or attempted commission of the crime] of burglary or robbery is murder of the first degree when the perpetrator had the specific intent to commit burglary or robbery. [¶] The specific intent to commit burglary or robbery and the commission or attempted commission of that crime must be proved beyond a reasonable doubt";

(E) "Every person who unlawfully kills a [human being] [with malice aforethought] [or] [during the commission or attempted commission of burglary or robbery], is guilty of the crime of murder in violation of Penal Code Section 187." The killing [was done with malice aforethought] [or] [occurred during the commission or attempted commission of burglary or robbery]"; and

14

(F) "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of burglary or robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

Even though the jury was instructed on the natural and probable consequences doctrine—the prosecutor relied on felony murder as the basis for defendant's murder conviction. During closing argument in the underlying trial, the prosecutor stated, "As you know, the defendant in this case is charged with felony murder, felony murder of [the victim]; burglary, and attempted robbery." The prosecutor went on to state, "Now, what is murder? That's it. Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder, in violation of Section 187 of the Penal Code. Now, was this a murder? Yes. Why? Remember, the felony-murder rule. The felony-murder rule. Any unlawful, even unintentional, even accidental, no matter who pulls the trigger, the killing that takes place during the commission of certain specified felonies—and you'll hear that burglary and robbery are those—is first degree murder. That's it. [¶] I told you in the beginning, it's as simple as A-B-C. It remains so. Unlawful killing during the commission or attempted commission. Defendant had the intent to commit the underlying felony."

15

Notwithstanding this argument by the People during closing argument, the jury did *not* specify under which theory the jury found defendant guilty. As noted *ante*, the jury was instructed on both the natural and probable consequences doctrine and felony murder; the jury's general verdict finding of guilt does not conclusively establish *which* of these theories the jury actually relied upon in returning that verdict. (See *People v. Edwards*, *supra*, 48 Cal.App.5th at p. 674.)

Thereafter, at the conclusion of the hearing on defendant's petition, the trial court stated that it remembered this case because he was the trial judge in the underlying trial. The court recalled the case because of the unique circumstances surrounding the case. The court remembered that the victim was a drug dealer who "had presumably money and/or drugs on him or in his car," and defendant stated that "he was approached by the perpetrator, the shooter so to speak, that this man would be an easy target. Let's rob him." Defendant agreed and consented to robbing the victim. Then, after the victim fled to an apartment, someone in the apartment let the victim in and called the police at the victim's request. After defendant and the other perpetrator walked in, the person in the apartment heard a struggle between the three men. She then heard the words, "Shoot him. Kill him. Give us the money. Give us the keys. . . . And what a . . . clear statement of intent to kill." The court then went on to note that the jury was instructed "on willful, deliberate murder." "So the theory of the case was always [defendant] was a major participant. If he wasn't the shooter, he was the aider and abettor, witnessed the statements that occurred. Those are the facts of the case."

16

However, as noted by the People in their August 4, 2021, letter, "[i]n *Lewis*, the Supreme Court cautioned that although a trial court can review the record of conviction to determine a petitioner's eligibility for relief, the court 'should not engage in "factfinding involving the weighing of evidence or the exercise of discretion." ' " [Citations.] The remedy for such an error, absent ineligibility as a matter of law, is remand for an evidentiary hearing." As explained *ante*, we agree with the People's assessment of case law and find that the trial court erred by engaging in factfinding, which involved the weighing of evidence.

In sum, because defendant has made a prima facie showing that he is entitled to relief under section 1170.95, and the record of conviction does not show him to be ineligible as a matter of law, the trial court's summary denial of his petition was in error. The matter is therefore remanded to the trial court for issuance of an order to show cause and an evidentiary hearing in accordance with subdivisions (c) and (d) of section 1170.95.

At the hearing following the trial court's issuance of an order to show cause, the prosecution will have the burden of proving beyond a reasonable doubt that appellant is *ineligible* for resentencing, and both parties may offer new or additional evidence on that issue. (§ 1170.95, subd. (d)(3).) However, we acknowledge that there is currently a split in authority on what legal standard a trial court should apply at a section 1170.95, subdivision (d) hearing. In *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309, Division One of the Second District Court of Appeal concluded the applicable standard is akin to substantial evidence review. That is, "[t]o

carry its burden, the prosecution must . . . prove beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder. This is essentially identical to the standard of substantial evidence . . . ."

Division Two of the Second District Court of Appeal, however, rejected this view in *People v. Fortman* (2021) 64 Cal.App.5th 217, review granted July 21, 2021, S269228. There, the court held "that, at the hearing contemplated by section 1170.95, subdivision (d), the People are required to prove *to the trial court* beyond a reasonable doubt that the petitioner is guilty of murder on a theory of murder valid after [Sen. No.] 1437's enactment." (*Id.* at p. 226; see *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, S265974; *People v. Duchine*, *supra*, 60 Cal.App.4th at p. 814 ["idea that the prosecution must prove beyond a reasonable doubt that there is substantial evidence in a prior record to support a hypothetical finding of guilt on a theory of murder that may never have been presented to a jury is beyond" incomprehensible]; *People v. Clements* (2021) 60 Cal.App.5th 597, 617-618, review granted Apr. 28, 2021, S267624; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 103; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 241-244, review granted Mar. 10, 2021, S266652.)

Our Supreme Court will resolve this split in *Duke*, but until it does, "we join the growing chorus that requires an independent finding by the trial court," and proof beyond a reasonable doubt by the People that the petitioner is ineligible for relief. (*People v. Fortman*, *supra*, 64 Cal.App.5th at p. 221.)

18

## DISPOSITION

The postjudgment order is reversed. The matter is remanded to the trial court for the issuance of an order to show cause and further proceedings in accordance with section 1170.95, subdivision (d). When the trial court conducts an evidentiary hearing in accordance with section 1170.95, subdivision (d)(3), the court, acting as an independent factfinder, must determine whether the prosecution has established beyond a reasonable doubt that defendant is guilty of murder on a theory of murder that remains valid after the changes in the law engendered by Sen. No. 1437 and is thus ineligible for relief.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.

19